**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **United States of America**, | : | |
| | : | Case No.: 2:13-cr-00183 |
| Plaintiff, | : | |
| | : | |
| v. | : | Judge Watson |
| | : | |
| **Amer Ahmad**, | : | |
| | : | |
| Defendant. | : | |

**MOTION FOR COMPASSIONATE RELEASE**

Defendant Amer Ahmad, through counsel, hereby respectfully moves the Court, pursuant to 18 U.S.C. 3582(c)(1)(A), to modify Mr. Ahmad's term of imprisonment to time served and to impose a special condition of supervised release that he serve a period of home confinement. Mr. Ahmad's health problems place him at higher risk for a catastrophic outcome if he contracts COVID-19. This motion is more fully explained in the attached memorandum in support.

Respectfully submitted,

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881)
MCNEES WALLACE & NURICK LLC
21 E. State Street, Suite 1700
Columbus, Ohio 43215
Telephone: (614) 719-2843
Facsimile: (614) 469-4653
kschneider@mcneeslaw.com

*Counsel for Defendant*

1

**MEMORANDUM IN SUPPORT**

**INTRODUCTION**

Defendant, Amer Ahmad, was sentenced by this Court to serve a fifteen-year term of imprisonment.  (R.179, Judgment, PAGEID #686.)  Mr. Ahmad is not decrying his sentence, nor is he seeking to avoid serving the remainder of his sentence.  However, the spread of COVID-19 throughout the Bureau of Prisons ("BOP") poses a very real risk to the health and safety of inmates and the community.  Mr. Ahmad is serving his sentence at the Federal Correctional Institution at Terminal Island ("Terminal Island"), which has seen one of the largest outbreaks of COVID-19 in the BOP[1].  The risk to Mr. Ahmad, should he contract COVID-19, could be deadly given his serious medical conditions – hypertension (high blood pressure), asthma, diabetes, and borderline obesity – all of which are or may be risk factors under the Centers for Disease Control ("CDC") guidelines.

The Court is well-aware of the non-violent nature of Mr. Ahmad's offenses, which involved his corrupt acts as a public official and bribery.  There is no downplaying the seriousness of Mr. Ahmad's conduct, nor is he seeking to do so.  Mr. Ahmad seeks to serve the remainder of his sentence in a safe environment, as the Constitution provides, and not risk contracting a potentially fatal virus because the BOP could not protect him from COVID-19.  His current release date, according to the Bureau of Prison's website, is February 6, 2027[2].

---

[1] According to the BOP's website, Terminal Island houses 968 inmates and, as of July 6, 2020, a total of 679 inmates have, have had, or have died from COVID-19, which is approximately 70%. *See,* https://www.bop.gov/coronavirus/ (last visited July 7, 2020).  While the BOP reports that the majority of those inmates have "recovered," no criteria is provided as to how that determination was made and at least one "recovered" inmate, Adrian Solarzano, subsequently died.

[2] In other words, Mr. Ahmad will have served 50% of his sentence in September 2020.

## BACKGROUND

**Personal History and Procedural Background**

Mr. Ahmad's personal background is described in the Presentence Investigation Report ("PSR") and his case is notorious.  For those reasons, counsel will not belabor those matters here but will only touch on some highlights.

Mr. Ahmad is forty-five years old, well-educated, and has no other criminal history.  He is divorced, effectively estranged from his children, financially bankrupt, and his reputation is, rightfully so, below regard.  His actions tarnished the Ohio Treasurer's Office and eroded public confidence in Ohio's public institutions.  He will never hold public office or a position of trust again.  But, "[no] matter what a waste one has made of one's life, it is ever possible to find some path to redemption, however partial." Charles Frazier, "Cold Mountain," p.297 (2007.)  Mr. Ahmad's post-incarceration conduct, discussed in greater detail below, shows that he is on the right path and poses a low-risk of danger if released.

**The COVID-19 Pandemic Spreads Throughout BOP Facilities**

Attached for the Court's consideration are expert affidavits that generally address the increased public health risks from keeping at-risk inmates, such as Mr. Ahmad, incarcerated during the pandemic.  *See,* Affidavit of Dr. Brie Williams, attached as Exhibit A; Declaration of Jaimie Meyer, attached as Exhibit B.

Dr. Jaimie Meyer, an infectious disease expert, explains that:

Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. When people must share dining halls, bathrooms, showers, and other common areas, the opportunities for transmission are greater. When infectious diseases are transmitted from person to person by droplets, the best initial strategy is to practice social distancing.  When jailed or imprisoned, people have much less of an opportunity to protect themselves by social distancing than they would in the community.  Spaces within jails and prisons are often also

3

poorly ventilated, which promotes highly efficient spread of diseases through droplets.  Placing someone in such a setting therefore dramatically reduces their ability to protect themselves from being exposed to and acquiring infectious diseases.

(Ex. B, Declaration of Jaimie Meyer, M.D.). Dr. Meyer opines that "[r]educing the size of the population in jails and prisons can be crucially important to reducing the level of risk both for those within those facilities and for the community at large." *Id.* at p. 7.  "This is more important still for individuals with preexisting conditions (e.g., heart disease, chronic lung disease, chronic liver disease, suppressed immune system, diabetes) or who are over the age of 60.  They are in even greater danger in these facilities, including a meaningfully higher risk of death." *Id.*

Likewise, Dr. Brie Williams, a Professor of Medicine at the University of California, San Francisco, argues that "[r]educing the overall population within correctional facilities will also help medical professionals spread their clinical care services throughout the remaining population more efficiently. With a smaller population to manage and care for, healthcare and correctional leadership will be better able to institute shelter in place and quarantine protocols for those who remain. This will serve to protect the health of both inmates as well as correctional and healthcare staff." (Ex. A, Affidavit of Brie Williams, M.D.).

The Bureau of Prisons has also recognized the extraordinary nature of the threat by significantly modifying its operations, establishing its COVID-19 resource page on its website, and through other means, and in recognition of the lethal threat posed by the virus has, as of this writing, on its own released 3,049 inmates into home confinement. *See, BOP COVID-19 Resource Page,* https://www.bop.gov/coronavirus/.

The BOP's modified operations and COVID-19 response plan, although commendable, would, at best, "flatten the curve" and by doing so lessen the burden on BOP medical facilities.  It would not, however, save inmates such as Mr. Ahmad from contracting the virus, nor does it help

4

ensure that BOP facilities will not be further strained by the need to keep inmates and staff who

may be positive from those who may not be.

**Attorney General Barr's Directive to the BOP**

In his March 26, 2020 memorandum to the Director of BOP concerning "Prioritization of

Home Confinement As Appropriate in Response to COVID-19 Pandemic," the Attorney General

wrote that "[t]here are some at-risk inmates who are non-violent and pose minimal likelihood of

recidivism and who might be safer serving their sentences in home confinement rather than in BOP

facilities." *See,* https://www.justice.gov/file/1262731/download.  Included was a non-exhaustive

list of factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;
- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;
- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;
- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;
- Whether the inmate has demonstrated and [sic] verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;
- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.  Some offenses, such as sex offenses, will render an inmate ineligible for home detention.  Other serious offenses should weigh more heavily against consideration for home detention.

*Id.*

Counsel submits that these factors are relevant to the Court's consideration because they

provide guidance in determining whether an inmate is a risk of danger.  As shown below, Mr.

Ahmad meets the factors outlined by the Attorney General.

**Mr. Ahmad's Vulnerability to COVID-19**

The CDC lists conditions that place one "[a]t a higher risk of severe illness from COVID-19:" including, obesity (defined as a BMI greater than 30) and Type 2 Diabetes. *See,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. The CDC guidelines goes on to state that "[p]eople with the following conditions **might be at an increased risk** for severe illness from COVID-19:" including, asthma (moderate to severe) and hypertension or high blood pressure. *Id.*

Counsel has not yet been able to obtain a copy of Mr. Ahmad's medical records from the BOP. However, the BOP has control of and access to Mr. Ahmad's medical records and can provide them to the Court or to the U.S. Attorney's Office. Upon information and belief, Mr. Ahmad was recently diagnosed with diabetes and severe hypertension. He is five feet eight inches tall and weighs approximately 175 pounds, which places his body mass index ("BMI") at 26.6 in the overweight category and nearly obese (defined as BMI greater than 30). *See,* https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm. He also has a history of asthma. PSR at ¶96.

These conditions, individually and together, place him at a higher risk of a severe outcome should he contract COVID-19.

**Mr. Ahmad's Release Plan**

Mr. Ahmad would live with his parents at 2211 Donner Street, NW, North Canton, Ohio. Prior to doing so, Mr. Ahmad would be picked up from Terminal Island by a close friend and then self-quarantine for two weeks at her residence in the Las Vegas, Nevada area until he can safely travel to Ohio.

His parents will also provide for his other basic financial and insurance needs until he is able to obtain employment and cover those expenses himself.

It is indisputable that residing with his parents, both of whom are retired, would allow Mr. Ahmad to socially distance from others thereby presenting a much lower risk of contracting the virus than if he were to remain at Terminal Island.

**Low-Risk of Danger or Recidivism**

Mr. Ahmad is a 45-year old first-time, non-violent offender.  The United States Sentencing Commission's study on "The Effects of Aging on Recidivism Among Federal Offenders" provides strong evidence that those over 30 at the time of their offense and that were a Criminal History Category I are the least likely to reoffend and that, generally, people are less likely to commit crimes the older they are. *See,* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

Additionally, because Mr. Ahmad is now a convicted felon and will be supervised whenever he is released from prison, there is very little chance that he would be in a position to commit another fraud or abuse a position of trust.  Moreover, Mr. Ahmad's clean institutional record, a PATTERN score of minimum, and confinement low security facility weigh in favor of a finding that he is not a danger to the community.

**ARGUMENT**

**The Court Has Authority to Modify Mr. Ahmad's Sentence**

18 U.S.C. § 3582(c)(1)(A)(i) allows a district court to modify a final "term of imprisonment" when "extraordinary and compelling reasons warrant such a reduction."  When first enacted, § 3582 conditioned the reduction of a term of imprisonment upon the filing of a motion by the Director of the BOP requesting the sentence reduction.  Until the recently enacted

7

First Step Act, district courts only had authority to reduce a defendant's sentence based on extraordinary and compelling reasons after a motion filed by the Director of the BOP. *See, United States v. Ebbers,* 2020 WL 91399, at *4, 02-CR-1144 (VEC) (ECF No. 384) (S.D.N.Y. Jan. 8, 2020).

Under § 3582(c)(1)(A), as amended by the First Step Act, inmates are empowered to seek compassionate release on their own where the BOP either refuses to file the motion or fails to act on an inmate's request to do so. An inmate must wait to file such a motion for the BOP to decline his request or for 30 days to pass after the warden's receipt of the request, whichever is earlier. On April 25, 2020, Mr. Ahmad, submitted a request to the Warden of FCI Terminal Island, as required by 18 U.S.C. § 3582(c)(1)(A), asking that the BOP file a motion to modify his sentence. Attached as Exhibit C is a copy of Mr. Ahmad's request. More than 30 days have passed since the warden of Terminal Island received Mr. Ahmad's request, therefore this motion is timely.

**Extraordinary and Compelling Reasons**

The Sentencing Commission's statements concerning various reasons for sentence reduction do not constrain the Court's independent assessment of whether extraordinary and compelling reasons warrant a reduction in light of the First Step Act. *United States v. Beck,* 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019); *see also Ebbers,* 2020 WL 91399, at *4. "[T]he district court themselves have the power to determine what constitutes extraordinary and compelling reasons for compassionate release." *United States v. Young,* 2020 WL 1047815, at *6 (M.D. Tenn. March 4, 2020) (collecting cases). Nonetheless, "[i]n making its decision, a court must also consider the [sentencing] factors set for in section 3553(a) to the extent they are applicable." *Ebbers,* quoting § 3582(c)(1)(A).

Those sentencing factors show that in considering motions for compassionate release, the Court is not limited to medical condition, age, and family circumstances.  In fact, the Commission has created several categories of qualifying "extraordinary and compelling reasons," including those three categories, but also including "Other Reasons," for circumstances in which the Director of the BOP – or, following the First Step Act, the Court at an inmate's request – determines that there is "an extraordinary and compelling reason <u>other than</u>, or in combination with," the reasons already described. U.S.S.G. § 1B1.13, Application Note 1(A) (emphasis added).

Furthermore, since the First Step Act's enactment, district courts around the country have repeatedly held that they are vested with broad discretion to find "extraordinary and compelling reasons" for a duction in sentence that go beyond the technical requirements set forth in BOP regulations and U.S.S.G. 1B1.13.  *See, e.g., United States v. Redd,* 97-cr-6, 2020 U.S. Dist. LEXIS 45977 at *7-12 (E.D. Va. March 16, 2020); *United States v. Maumau,* 08-cr-748, 2020 WL 806121 (D. Utah Feb. 18, 2020); *United States v. Urkevich,* 03-cr-37, 2018 WL 6037391 (D. Neb. Nov. 14, 2019); *United States v. Beck,* 1:13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *United States v. Cantu,* 1:05-cr-458-1, 2019 WL 2498923 (S.D. Tex. June 17, 2019).

Consistent with the text of § 3582(c)(1)(A), the Sentencing Commission, in guidelines that were enacted before the First Step Act, made plain that reasons beyond medical conditions, age, or family circumstances can form the basis for the extraordinary and compelling reasons necessary for a sentence reduction, and that those reasons need not be based solely on changes to a defendant's circumstances after sentencing.  Thereafter, Congress, in the First Step Act, authorized courts to reduce sentences under § 3582(c)(1)(A) without the necessity of a motion by the BOP, and courts nationwide have subsequently recognized that a wide range of circumstances can provide extraordinary and compelling reasons for compassionate release.

**Extraordinary and Compelling Reasons Exist for a Reduction of Mr. Ahmad's Sentence**

*Federal Prisons and Communities and the COVID-19 Pandemic*

The CDC is urging everyone to take extra measures to put distance between themselves and other people to further reduce their risk of being exposed to this new virus. *See* CDC, *How to Protect Yourself & Others,* at https://cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html. But, the conditions in federal prisons are the exact opposite of social distancing. Inmates sleep, eat, go to the bathroom, shower, brush their teeth, clean their utensils, and commune in extremely close enclosed quarters with limited ventilation. Soap is hard to come by and effectively rationed through the commissary system. Hand sanitizers are typically forbidden because of their alcohol content. Bathrooms are small, toilets are generally uncovered and cleaning (mainly done by the inmates themselves) is rudimentary. *See generally* Hannah Cox, *Coronavirus Will Turn Our Prisons Into Death Zones Without Reform,* Wash. Examiner, March 17, 2020. All of these conditions are aggravated to the extent that prisons are locked down as reported.

Moreover, federal prisons are not self-contained, isolated facilities. In usual circumstances, thousands of correctional officers, healthcare workers, educators, religious personnel, vendors, and visitors go in and out of prison every week. All have families and communities of their own making the infectious reach of the American prison population almost incalculable. *See* Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues,* N.Y. Times, March 16, 2020.

There are regular outbreaks of infectious diseases at prisons throughout the country. At FCC Coleman in Florida, for example, there was an outbreak of Legionnaires Disease just this past

10

December.  During the H1N1 epidemic in 2009, many jails and prisons dealt with a high number of cases.  Every flu season U.S. jails and prisons experience high rates of influenza contagion.

Public health officials, criminal justice reform advocates and educators have been sounding the alarm for the public – and the government – about the unprecedented risks faced by correction officials and inmates in state and federal prison facilities and of the need to move the most vulnerable of inmates out of these facilities.  *See, e.g., Desmond Meade & Neil Volz, 'People First' Policies Needed To Confront COVID-19 In Prisons, Jails. It's Not About Politics,* Sun Sentinel, April 14, 2020; J.J. Prescott, Benjamin Pyle & Sonja Starr, *It's Time to Start Releasing Some Prisoners with Violent Records,* Slate, April 13, 2020; Brett L. Tolman & Holly Harris, *Coronavirus Crisis Requires This Action Be Taken for Elderly Prison Inmates,* Fox News, March 18, 2020; Harper Neidig, *Advocates Warn of Coronavirus Threat to Inmates,* The Hill, March 22, 2020; Hope Corrigan, *Coronavirus Risk Looms Large for America's Elderly and Sick Prison Population,* Quartz, March 20, 2020.  These informed commentaries echo the calls coming from a range of criminal justice and public health groups calling for the release of inmates who are at risk for infection and death from COVID-19 in order to mitigate the public health risks and resource challenges created by crowded prisons.

*Compassionate Release for Mr. Ahmad*

The most logical approach to relieve the immediate pressure on the prison healthcare system is to minimize the number of inmates who pose a low risk to the community, but who may be at highest risk of being infected and then suffer or die while also transmitting the disease.

It is well established that older non-violent offenders such as Mr. Ahmad are the least likely to re-offend and have the lowest recidivism rates in the overall prison population.  By releasing non-violent inmates such as Mr. Ahmad under 18 U.S.C. § 3582(c)(1)(A), this Court will still have

11

the offender under close monitoring which can (1) reduce the inevitable deadly severity of COVID-19 outbreaks in federal prisons and the surrounding communities, (2) free up limited prison healthcare resources and personnel to focus on stemming the outbreaks in the first place, (3) reduce the interaction of healthy inmates, visitors, personnel, vendors, and others with the prison population most likely to carry and transmit the virus and (4) significantly reduce the stress on the healthcare system throughout the nation which will definitely feel the impact of jail and prison COVID-19 outbreaks as soon as the limited healthcare facilities in those prisons are overrun.

Mr. Ahmad is highly vulnerable to COVID-19 due to hypertension, diabetes, asthma and borderline obesity, as discussed above. He is also an inmate at a BOP facility that has had approximately 70% of its inmates infected with COVID-19.

There is an urgent need to act now, before Mr. Ahmad becomes infected. The conditions at Terminal Island do not allow Mr. Ahmad to take the self-care measures recommended by the CDC to protect his health. *See, United States v. Yellin,* 2020 U.S. Dist. LEXIS 112786, 2020 WL 3488738, at *7-8 (S.D. Cal. June 26, 2020) (granting compassionate release due to combined effect of the inmate's health and the specific conditions at Terminal Island); *see also, United States v. Richardson,* 2020 U.S. Dist. LEXIS 108043, 2020 WL 3402410 (E.D. Cal. June 19, 2020) (same). However, if released Mr. Ahmad would be able to self-quarantine, utilize social distancing and follow CDC guidelines to further minimize the risk of infection.

*Not a Danger to the Public*

Mr. Ahmad is a 45-year old first-time, non-violent offender. Additionally, because Mr. Ahmad is now a convicted felon and will be supervised whenever he is released from prison, there is very little chance that he would be in a position to commit another fraud or abuse a position of trust. Moreover, Mr. Ahmad's clean institutional record, a PATTERN score of minimum, and

confinement low security facility weigh in favor of a finding that he is not a danger to the community.

*3553(a) Factors*

To the extent the factors under 18 U.S.C. § 3553(a) have not been addressed above, Mr. Ahmad submits that, based on his post-incarceration conduct, the amount of time he has actually served in prison, imposition of home confinement during supervised release, and consideration of providing restitution to the State of Ohio weigh in favor of compassionate release.

Mr. Ahmad has not had any disciplinary infractions while in the BOP.  He is incarcerated at a low-security facility, and has a PATTERN score of minimum.  It is one thing to simply remain free of trouble while idling the time away and another to stay free of trouble while pursuing proactive activities.  Mr. Ahmad has done the latter.  While at Terminal Island, Mr. Ahmad has completed over 200 educational courses.  Attached as Exhibit D is a copy of Mr. Ahmad's educational transcript from the BOP, date May 28, 2020.  In addition to furthering his own education, he has worked as a tutor and/or taught classes in the GED, Adult Continuing Education, and the Re-entry Preparation programs.

Come September, Mr. Ahmad will have served 50% of his 15-year prison sentence. Substituting home confinement for the remainder of his unserved prison sentence would still reflect the seriousness of his offenses, provide just punishment, and promote respect for the law. Mr. Ahmad has been specifically deterred from future crime, and the substantial amount of time he has served and would continue to serve under home confinement would provide adequate deterrence to others.

Finally, allowing Mr. Ahmad to serve the remainder of his sentence on home confinement will give him the opportunity to seek employment, as approved by the Court's probation department, thereby making meaningful payments toward restitution.

**Conclusion**

The threat to Mr. Ahmad's life, posed by COVID-19, is extraordinary and compelling given his health problems and the conditions at FCI Terminal Island.  Based on the foregoing, counsel respectfully requests that the Court grant this motion and reduce his sentence of imprisonment to time served and to impose a special condition of supervised release that he serve a period of home confinement.

Respectfully submitted,

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881)
MCNEES WALLACE & NURICK LLC
21 E. State Street, Suite 1700
Columbus, Ohio  43215
Telephone: (614) 719-2843
Facsimile: (614) 469-4653
kschneider@mcneeslaw.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically filed with the Clerk of the United States District Court using the CM/ECF system, which will send notification of such filing to all attorneys of record including Assistant United States Attorney Doug Squires on July 9, 2020.

*/s/ Karl H. Schneider*
Karl H. Schneider (0012881)

14